UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Criminal No. 14-36-ART-HAI |
| v. | ) ) | |
| ELLIOT C. CAMPBELL, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\*

Intent is often all that separates the innocent conduct from the guilty: accidental death from homicide, a joking "I could kill him" from a true threat to murder, or wire fraud from simple breach of contract. Here, Elliot and Melinda Campbell were indicted for wire fraud and extortion. According to the indictment, they fraudulently promised to deliver cargo using certain shipping methods—and to demand payment only post-delivery—but never intended to honor those promises. Instead, they allegedly shipped the cargo using generic methods and then held the cargo hostage until the customers paid up front. The Campbells now move to dismiss the indictment, primarily arguing that the facts alleged amount only to breach of contract—not fraud. The Campbells are of course free to argue at trial that they lacked the requisite intent to commit these crimes; if the jury believes them, then they must be acquitted. At the motion-to-dismiss stage, however, the Court must take the allegations in the indictment as true. And the indictment here alleges that the Campbells made their promises with no intent to keep them. The Campbells' motion to dismiss is therefore denied.

I.

In September of 2015, a grand jury indicted the Campbells for wire fraud, conspiracy, and extortion. *See* 18 U.S.C. § 1343; *id.* § 371; *id.* § 1951; *see also* R. 1. The Campbells control various trucking companies, which, according to the indictment, they used to run a fraud scheme in Perry County, Kentucky. R. 1 at 1. The Campbells would use their trucking companies "to place bids on requests for the interstate shipment of cargo freight made by shipping brokers." *Id.* at 2. They would then contract to ship cargo subject to certain conditions. *Id.* Specifically, they would promise to transport the cargo "in an expedited fashion, with a 'dedicated' team of drivers, or as an 'exclusive load.'" *Id.* They would also promise to seek payment only after they delivered the cargo to its destination. *Id.*

Rather than honoring these contractual terms, the indictment alleges, the Campbells would instead consolidate the cargo onto single trailers and use a single driver rather than a dedicated team. *Id.* at 3. And instead of asking for payment post-delivery, the Campbells would instead "threaten not to deliver the cargo freight to its contracted-for destination unless and until the [customer] rendered payment." *Id.* Word of such shady dealing eventually gets around, of course, so the Campbells allegedly took precautions to conceal their conduct: they would "organize[] new trucking companies," and use "aliases or false names" to "mislead[] customers about their identities and avoid[] the poor reputation their scheme had created." *Id.* at 3–4. According to the indictment, they also used these fake names and aliases to register their companies with the Federal Motor Carrier Safety Administration, falsely certifying that they had "no relationship with any other [Administration-regulated] entity within the past 3 years." *Id.* (internal quotation marks omitted). Finally, the indictment alleges that the Campbells used "wire communication in

interstate commerce" to carry out these crimes. *Id.* at 4. The Campbells now move to dismiss the indictment. R. 107.

## II.

### A.

The Campbells first move to dismiss the wire-fraud counts because, in their view, those counts "fail to state facts sufficient to allege wire fraud." R. 107-1 at 1. Although the "language of the statute may be used in the [indictment's] general description of the offense," the indictment must also include "a statement of facts and circumstances as will inform the accused of the specific offense . . . with which he is charged." *United States v. Landham*, 251 F.3d 1072, 1079 (2001); *Hamling v. United States,* 418 U.S. 87, 117–18 (1974). Thus, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish [a] prima facie [case against the defendant]." *Id.* (quoting *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992)).

The crime at issue here, wire fraud, has three elements. The Campbells concede that the indictment properly alleges all but one of them: namely whether the Campbells engaged in "a scheme or artifice to defraud," *i.e.*, "any plan or course of action by which someone intends to deprive another by deception of money[.]" *United States v. Daniel*, 329 F.3d 480, 488 (6th Cir. 2003). The indictment alleges on its first page that the Campbells "knowingly and intentionally devise[d] a scheme and artifice to defraud[.]" R. 1 at 1. And in later pages, the indictment goes on to spell out exactly how the Campbells did so. Specifically, the indictment alleges that the Campbells would promise to ship customer cargo as an "exclusive load," in an "expedited fashion," with a "dedicated team of drivers," and with payment due

3

only "after the [defendants' company] timely transported the cargo freight to its destination." R. 1 at 2.

Instead of delivering on those terms, the indictment alleges, the Campbells would "consolidate cargo freight . . . onto single trailers," would use a "single driver" rather than a "dedicated team," and would "threaten not to deliver the cargo freight to its contracted-for destination unless and until the shipping broker rendered payment." R. 1 at 3. When customers complained, the Campbells allegedly "organized new trucking companies" and used "false names," for example "Vickie Vonn," "Vinnie Vonn," and "Vickie Veil." *Id.* at 3–4. By using these false names, the indictment alleges, the Campbells managed to "continue their scheme by misleading customers about their identities" and thereby "avoid[] the poor reputation their scheme had created." R. 1 at 3. If the government proves these allegations at trial, it will have made at least a "prima facie" showing that the Campbells engaged in "a plan or course of action by which [they] intend[ed] to deprive another by deception of money[.]" *Daniel*, 329 F.3d at 488. The "money" in question was the payment for delivery services. The "deception" in question was the Campbells' statement that they would deliver the goods in the promised way. And thus the indictment seems to be sufficient as to the wire-fraud counts.

In response, the Campbells note that "mere breach of contract does not equate to fraud; nor should fraud be inferred from a violation of a private contract." R. 107-1 at 2. Thus, the Campbells seem to suggest, the indictment alleges at most conduct that would warrant civil penalties but not criminal ones. *Id.* It is certainly true that a promisor does not commit wire fraud—or fraud at all—when he merely fails to follow through with his contractual duties. A person may breach a contract innocently. But if the "promisor never

4

intended to honor the contract" in the first place, then his breach is not an innocent one, and thus he does commit fraud. *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994).

The question, then, is simply whether the indictment alleges that the Campbells made a promise that they never intended to keep at the time they made it. As it turns out, the indictment alleges precisely that, *i.e.*, that the Campbells made "materially false and fraudulent pretenses, representations[,] and promises." R. 1 at 1. The Campbells are of course entitled to put the government to its proof. And thus they may argue at trial that, each time they promised to ship cargo in an expedited fashion with a dedicated team of drivers and so on, they truly intended to honor those promises and thus breached the contract only innocently. But the government alleges that the promises here were not so innocent, and thus the indictment properly alleges a scheme or artifice to defraud.

B.

Second, the Campbells argue that the Court should dismiss the conspiracy count because it "rests entirely on the factual allegation[s] in Counts 1-6." R. 107-1 at 4. Because "those counts fail to allege facts sufficient to indict on the predicate acts," they say, "the Court should likewise dismiss the conspiracy count." *Id*. "Simply put," their argument is that "the conspiracy [count] does not allege an agreement to commit an unlawful act." *Id*. As explained above, however, Counts 1-6 do in fact allege wire fraud. *See supra* Part II.A. And the conspiracy count alleges that the Campbells "conspired and agreed together" to commit that fraud. R. 1 at 6. Thus, the conspiracy count is also sufficient.

C.

Finally, the Campbells argue that Count 8 of the indictment fails to allege the crime of

5

conspiracy to commit extortion. R. 107-1 at 4. Under the Hobbs Act, a person may not conspire to "obstruct[], delay[], or affect[] commerce" by "robbery or extortion." 18 U.S.C. § 1951(a). The Act goes on to define "extortion" as the "obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). "Fear," as used in the Hobbs Act, includes the fear of "economic harm." *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006). Under this theory of extortion—which we might call the "economic-fear theory"—the defendant is guilty if he "receives payment from the victim because the victim believes that the defendant can exercise his or her power to the victim's economic detriment." *Id.*

Here, the indictment alleges that the Campbells conspired to "obtain the property [of several companies] which were at the time engaged in the business of shipping cargo in interstate commerce, with those companies' consent induced by the wrongful use of fear of economic loss." R. 1 at 8 (citing 18 U.S.C. § 1951). In the manner and means section of the indictment, the government alleges that the Campbells would first promise to ask for payment only after delivering the customers' cargo. After taking the cargo, however, the Campbells would allegedly "hold the cargo freight and . . . threaten not to deliver [it] to its contracted-for destination unless and until the shipping broker rendered payment." *Id.* at 2–3. Thus, the indictment alleges that the Campbells obtained "money from another," namely the money the customers paid for cargo delivery. And it alleges that the Campbells did so "by the wrongful use of . . . threatened [economic fear]," namely the fear that the customers would lose their cargo entirely if they didn't pay up. R. 1 at 8. Thus, the indictment sufficiently alleges extortion.

In response, the Campbells say that they were just demanding payment before

delivering a good, much like a "cashier[] at McDonald's" demands payment "before delivering a customer's food." R. 107-1 at 4. Not quite. Before a fast-food customer pays for the food, he does not have a right to the food at all. Thus, when the cashier asks the customer to pay, the cashier does not acquire the customer's money by threat of economic harm. Instead, the cashier acquires the customer's money in exchange for a promise to trade the customer something of value in return, namely fast food. On the other hand, if the cashier takes payment from the customer but refuses to deliver the hamburger unless the customer ponies up 100 more dollars, that would indeed be extortion. For in that scenario, the customer already has a right to the hamburger. Thus, if the customer decides to pay up, the cashier will not have acquired the customer's money in exchange for a promise to trade something of value in return. The cashier will instead have acquired the customer's money via a threat of economic harm (at least on a small-fry scale), namely the threat to withhold the hamburger that the customer *already* had the right to possess.

Similarly, the customers here had a contractual right to delivery of their cargo without paying anything up front, and the Campbells conversely had no right to the customers' money until the Campbells delivered the cargo. Thus, if the Campbells asked the customers for money pre-delivery, they would be asking for money to which the Campbells had no legal right. And if they threatened to hold hostage the customers' property unless the customers paid that money, then they obtained the customers' money by threat of economic harm, namely the threat to hold hostage the customers' cargo. The indictment alleges that the Campbells did exactly that. Hence the indictment alleges extortion. *Id.*

One might respond that this hypothetical situation is not like this case at all. For in the McDonald's scenario, the cashier would have no right to the hundred dollars at any point

7

in time.  Here, in contrast, the Campbells did have a right to payment at some point—namely post-delivery—albeit at some point in the future.  But that distinction is irrelevant.  The government may prove extortion by showing that the defendant "obtain[ed] property from another" via threat of economic harm.  And thus it doesn't matter that the Campbells were entitled to the customers' money at some point.  The point is that they were not entitled to the money pre-delivery but tried to obtain the money anyway by way of threat rather than promise to give something of value in return.

   To take another example, assume that a customer negotiates with a valet company to take custody of his car for a few hours.  The valet tells the customer that the company will not bill him until 30 days later, and the customer agrees.  When he returns to take back his car, however, the valet tells the customer that he must pay immediately.  If he does not do so, the valet says, then the valet company will not give him back his car.  In this scenario, the valet is not entitled to payment when the customer returns.  Thus, when the valet threatens to keep the car unless the customer pays, the valet is attempting to obtain the customer's money by threat of economic harm.  Hence the valet is guilty of extortion (or perhaps attempted extortion, depending on whether the customer pays up or not).

   The ultimate question in an economic-fear-theory case, then, is this: did the victim have a legal right to the property at the time when the defendant threatened to withhold that property unless the victim pays the defendant money?  If so, then a defendant threatens economic harm when he threatens to withhold the property unless the victim pays.  If not, then the defendant threatens no harm at all when he threatens to withhold the property without payment.  And thus the precise terms of the contract determine whether a defendant commits extortion or commits no crime at all.

Here, though, the indictment alleges that the Campbells had no right to the customers' money when they threatened to withhold the cargo unless the customers paid. And thus the indictment alleges that the Campbells obtained the customers' money via a threat of economic harm. Hence the government has alleged extortion. This is admittedly not the "classic" extortion situation, in which a defendant threatens to inflict physical harm on a victim's family unless the victim pays a ransom. But given the elements of extortion as defined by federal law, the government's allegations state a prima facie case.

The government will of course need to prove up these allegations at trial and convince a jury to convict. If the Campbells believe that the government's proof at trial is legally insufficient to support a conviction for extortion, then they are of course free to file a motion for a judgment of acquittal at the appropriate time. *See* Fed. R. Crim. P. 29. At the motion-to-dismiss stage, however, the Court's only obligation is to determine whether the government has alleged the elements of a prima facie case. The government has done so, which means the Campbells' motion to dismiss, R. 107, is **DENIED**.

This the 27th day of January, 2016.

Signed By:
*Amul R. Thapar* AT
United States District Judge